SLAYBACK VAN ORDER COMPANY, A BODY CORPORATE, PROSECUTOR, v. MICHAEL EIBEN, ADMINISTRATOR OF THE ESTATE OF MARY NOVICK, DECEASED, AND THE COURT OF COMMON PLEAS IN AND FOR THE COUNTY OF ESSEX, RESPONDENTS.

Argued October 2, 1934—Decided March 27, 1935.

Before Justices HEHER and PERSKIE.

For the prosecutor, *Herbert R. Baer.*

For the respondents, *Franklin J. McGlynn.*

The opinion of the court was delivered by

HEHER, J.   The decisive question here is whether the death of Michael Novick, the husband of Eiben's intestate, was the result of an accident which arose out of and in the course of his employment with prosecutor.   It was resolved in the affirmative in the Essex Common Pleas, and compensation was awarded under the Workmen's Compensation act. *Pamph. L.* 1911, *p.* 134.   The compensation bureau ruled that the burden of proof had not been sustained.

These are the circumstances:   On October 27th, 1928, Michael Novick was employed by prosecutor as a yardman

in the coal yards maintained by it at Caldwell, New Jersey. He was required to unload coal from cars delivered to his employer's railroad siding. It is claimed that, on the day named, while engaged in opening a door of a coal car by means of a large wrench, the instrument accidentally slipped from its position, and struck his face below the right eye, causing a pin-point laceration; and that this became the portal of entry for the streptococcus germ, which, in turn, produced facial erysipelas in the course of time, and death on November 16th following. On February 25th, 1929, his widow, Mary, filed a petition for compensation in the bureau. The determination there was that, while Michael was the victim of an accident which arose out of and in the course of his employment, the petitioner "failed to sustain the burden of proof in establishing that death was due to traumatic erysipelas by means of the germ entering at the point of the laceration under the right eye." There was a further finding, under the doctrine laid down in *Atchison* v. *Colgate & Co.*, 3 *N. J. Mis. R.* 451; 128 *Atl. Rep.* 598; *affirmed,* 102 *N. J. L.* 425; 131 *Atl. Rep.* 921, that the employer "has met the burden required of it and has affirmatively proven that death was caused by idiopathic erysipelas, the germ of which was contracted through some infected part of the inner nose." The petitioner thereupon appealed. During the pendency of the appeal she remarried, and shortly thereafter died. Her surviving husband, Eiben, was appointed administrator of her estate, and in that capacity was substituted as a party for the deceased petitioner.

The Court of Common Pleas concluded that the fatal disease was the result of the induction of the germ through the facial laceration caused by the blow of the wrench, and that the accident was therefore the "proximate and contributing cause of death." The employer thereupon sued out this *certiorari*.

The first insistence of prosecutor is that "there was no proof that the decedent sustained an accident arising out of and in the course of his employment." This claim is without substance. One Cheko, decedent's stepson and also a

co-laborer (he had been employed by prosecutor for seventeen years), testified that on the day in question he saw Michael using the wrench in an endeavor to open the coal car door. He was but a few feet away. He observed Michael holding "his hand over his right eye." This was a few moments after Michael "started to turn the wrench." He remained in this position—the right hand over his right eye—"probably two or three minutes, maybe more." The witness promptly went to Michael's assistance, and, using the wrench, opened the car door. While he was so engaged, Michael "stood there and hold (*sic*) his eye." When they quit work for the day, the witness perceived a discoloration underneath the right eye; and he noticed, when decedent reported for work the next day, that it was "still black;" and that there was a "very little cut—just like a little bit penknife, just like a little scratch" in that region. Decedent continued at work, but the witness noted a daily aggravation of his facial condition. He testified that the deceased made the following explanatory statement to him: "When he started to turn the wrench I happened to look the other way; I turn back; I ask him what is the matter. He said to me—— * * * *Q*. What did Mike say to you during that day, if anything? *A*. All I seen when holding his hand over his eye I ask him what is the matter and he said, 'I got hit with the wrench.' *Q*. When did he say that? *A*. When we was dumping the car of coal. *Q*. What was he doing when he said it? *A*. Then after he got the wrench in his one hand and he hold the other hand the eye." It is a logical inference that this conversation occurred immediately after the witness went to Novick's assistance.

Prosecutor maintains that the evidence relating to the statement or declaration claimed to have been made by decedent was essentially hearsay, and incompetent, as not within one of the exceptions to the rule excluding such evidence as untrustworthy. If the premise be correct, the evidence is inadmissible. *Helminsky* v. *Ford Motor Co.*, 111 *N. J. L.* 369. It remains to consider whether it was a declaration admissible as part of the *res gestæ*. A declaration is within

this rule when it is "concomitant with the main fact under consideration and is so connected with it as to illustrate its character." Where it is merely narrative of a past occurrence, it is not receivable as proof of the character of the occurrence. *Blackman* v. *West Jersey and Seashore Railroad Co.,* 68 *N. J. L.* 1.

Is this declaration a mere narrative of a past occurrence? We incline to the view that it is much more than that. It was exclamatory in character—the undesigned incident or emanation of the accident. It has the unquestioned element of spontaneity. The *res gestæ* includes those circumstances which are the undesigned incidents of a particular litigated act. They may be separated from the act by a lapse of time more or less appreciable, and may consist of remarks of any-one concerned, whether participant or bystander. They may comprise things left undone as well as things done. They must be the necessary incidents of the litigated act in the sense that they are part of the immediate preparations for, or emanations of, such act, and are not produced by the calculated policy of the actors. *State* v. *Doro,* 103 *N. J. L.* 88, 93; *State* v. *Kane,* 77 *Id.* 244; *Trenton Passenger Railway Co.* v. *Cooper,* 60 *Id.* 219; *Hunter* v. *State,* 40 *Id.* 495; *Donnelly* v. *State,* 26 *Id.* 601.

While Cheko's testimony leaves one in doubt as to the period intervening between the time of the alleged accident and the declaration, the case is yet within the principle. As pointed out in *State* v. *Doro, supra,* the lapse of time more or less appreciable is not, in itself, a conclusive criterion of admissibility. In an action upon a policy of insurance against personal injury by accident, the declaration of the deceased insured to his wife, upon his return to their bedroom during the night (he had left it but a short time before), that he had "fallen down the back stairs, and almost killed himself," was held to be admissible. *Travelers' Insurance Co.* v. *Mosley,* 75 *U. S.* 397; 19 *L. Ed.* 437. This case declares the underlying considerations for the rule in question. "To bring such declarations within this principle, generally, they must be contemporaneous with the main fact to which they

relate. * * * In the complexity of human affairs, what is done and what is said are often so related that neither can be detached without leaving the residue fragmentary and distorted. There may be fraud and falsehood as to both; but there is no ground of objection to one that does not exist equally as to the other. To reject the *verbal fact* would not infrequently have the same effect as to strike out the controlling member from a sentence, or the controlling sentence from its context. * * * Here the principal fact is the bodily injury. The *res gestæ* are the statements of the cause made by the assured *almost contemporaneously* with its occurrence, and those relating to the *consequences made while the latter subsisted and were in progress.* Where sickness or affection is the subject of inquiry, the sickness or affection is the principal fact. · The *res gestæ* are the declarations tending to show the reality of its existence, and its extent and character. The tendency of recent adjudications is to extend, rather than to narrow, the scope of the doctrine. Rightly guarded in its practical application, there is no principle in the law of evidence more safe in its results. There is none which rests on a more solid basis of reason and authority. * * * In the ordinary concerns of life, no one would doubt the truth of these declarations, or hesitate to regard them, uncontradicted, as conclusive. Their probative force would not be questioned. Unlike much other evidence, equally cogent for all the purposes of moral conviction, they have the sanction of law as well as of reason."

So here, the circumstances attending the making of the statement were calculated to give trustworthiness to it; there is a circumstantial guarantee of trustworthiness that is the practical equivalent of the ordinary test of cross-examination. The utterance was, to all intents and purposes, an undesigned incident of the litigated act; it was spontaneous and unreflecting—made before there had been time to contrive and misrepresent. It is not essential that it be strictly contemporaneous with the exciting cause; it may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. *Wigm. Ev.* (*2d ed.*),

§§ 1749, 1750. "Unless such complaints form a part of the *'res gestæ'* they cannot be admitted; and if they are. so far detached from the occurrence as to admit of deliberate design and be the product of a calculating policy on the part of the actors, then they cannot be regarded as part of the *'res gestæ.' " Kennedy* v. *Rochester City and B. Railroad Co.,* 130 *N. Y.* 654; 29 *N. E. Rep.* 141. The determination of this question is always inseparable from the circumstances of the case at bar; no two cases are exactly alike. *Jack* v. *Mutual R. F. Life Association,* 51 *C. C. A.* 36; 113 *Fed. Rep.* 49; *Wigm. Ev.* (*2d ed.*), § 1750. The close connection in time between the statement or declaration and the act of which it is said to be a part is an element for consideration; but being close in point of time is not, however, "all of the basis for receiving such evidence." The ultimate test is spontaneity or instinctiveness and logical relation to the main event; and the tendency of modern cases is to be liberal in the reception of such testimony. *Solice* v. *State,* 21 *Ariz.* 592; 193 *Pac. Rep.* 19.

And there was other evidence tending to establish the fact of an accident. There was no discoloration of decedent's face, or mark of injury, before the time of the claimed accident. Another co-worker, one Jemotti, testified that about two weeks before he became incapacitated with his fatal illness, decedent had a "black eye." Members of the family gave evidence of the facial injury; they observed "a blue mark on his eye, a little blue mark. * * * A little scratch just like if you do with a little pin." This was October 26th or 27th; the next day his face was swollen. Although suffering pain and discomfort, Novick continued to work until the following November 8th. The swelling increased, and he suffered from a head condition. When he returned home from work on the day last mentioned, he was physically distressed, and a physician was called. The medical examination disclosed a temperature of one hundred and three degrees, rapid pulse, flushed face and a severe headache. The examining physician found "a slight blue mark under the right eye." On November 10th, he observed "a marked swelling

underneath his left eye;" and on the 11th, this swelling had disappeared, but a similar swelling of the right eye had developed. He was then semi-conscious, with a temperature of one hundred and three and one-half, a rapid pulse and a severe headache. On the 12th, decedent was still semi-conscious, with the right eye practically closed, and a temperature of one hundred and four. The condition was diagnosed as erysipelas. The correctness of this diagnosis is not challenged, but it is insisted that the disease was idiopathic and not traumatic in its origin. This claim we find to be without substance.

It is fairly inferable from all the facts and circumstances that the fatal attack of erysipelas was directly traceable to an injury sustained by accident on the mentioned day, and we so find. There was medical evidence, entirely credible, that the streptococcus infection resulted from the face laceration. As one of the physicians put it, the injury was the "only cause I have been able to detect in all the testimony; any other cause would be a guess." The medical testimony also disposed of prosecutor's claim that the swelling under the left eye negatived streptococcus infection at the point of the laceration on the right side of the face; this was conclusively demonstrated to be of no significance. It was also made clear that the period of incubation after the entry of the germ varies, and that the claim that the facial erysipelas suffered by decedent could not have resulted from an infection occurring on the day of the accident is without substance. On the whole, the evidence affords a fair and reasonable presumption that decedent's death was caused by the accidental facial injury. Under the circumstances, that is a probable or a more probable hypothesis, with reference to the possibility of other hypotheses. The test is probability rather than certainty. *Hercules Powder Co.* v. *Nieratko,* 113 *N. J. L.* 195; 173 *Atl. Rep.* 606; *affirmed,* 114 *N. J. L.* 254; 176 *Atl. Rep.* 198; *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.,* 111 *N. J. L.* 487; 170 *Atl. Rep.* 22.

Lastly, prosecutor urges that the Court of Common Pleas erroneously awarded to the administrator's attorney a fee

for services rendered in the presentation of the cause to the compensation bureau. We do not think so. Section 20 of the Compensation act (*Pamph. L.* 1918, *pp.* 429, 436), vesting in Courts of Common Pleas a discretionary power to allow a counsel fee to the party prevailing on the trial of such an appeal is to be considered in the light of sections 17 and 19 of the act. Section 19, as amended by chapter 25 of the laws of 1932 (*Pamph. L.* 1932, *p.* 38), provides that, upon appeal the pleas shall "in a summary manner decide the merits of the controversy * * * on the transcript of the record and testimony." Section 17 confers upon "the official conducting any hearing under this act" discretionary authority to allow the party in whose favor judgment is entered a reasonable counsel fee, "when, in his judgment, the services of an attorney were necessary for the proper presentation of the case." The legislative purpose undoubtedly was to vest in the Courts of Common Pleas power to include in the judgment rendered, after the trial of the appeal, such allowance to counsel, for all services rendered in the presentation of the cause, as that tribunal may, in its discretion, deem proper. Such an intention is made clear by the provision of section 19 of the same act (as pointed out, it has since been amended), that the hearing of the appeal shall take the form of a trial *de novo.* And it is worthy of note that our appellate courts have assumed the existence of such power. *Fernandez* v. *Ford Motor Co.,* 12 *N. J. Mis. R.* 653; *affirmed, sub nom. Ford Motor Co.* v. *Fernandez,* 114 *N. J. L.* 202. The case of *Roxbury Township* v. *Plumstead,* 10 *N. J. Mis. R.* 1034, is not in point. There the allowance in the pleas was for services rendered in the Supreme Court on *certiorari,* and on appeal to our court of last resort. This was held to be an excess of power.

Judgment affirmed, with costs.